UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUDY LUZZI,<br><br>       **Plaintiff,**<br><br>v.<br><br>**HUB INTERNATIONAL NORTHEAST LTD., and FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC., a subsidiary of The Travelers Companies, Inc.**<br><br>       **Defendants.** | Civ. No. 15-6064<br><br>**OPINION** |

  The plaintiff, Judy Luzzi, brings this action against HUB International Northeast Ltd. ("HUB") and Fidelity and Guaranty Insurance Underwriters, Inc. ("Fidelity"), an affiliate of The Travelers Companies, Inc. ("Travelers").[1]

  Defendants now move for summary judgment. As to defendant HUB, the motion is granted on all Counts. As to defendant Fidelity, it is granted as to Count I, but denied as to Counts II and III.

---

[1]  In the record, "Travelers" and "Fidelity" are used interchangeably to refer to the plaintiff's insurer.

  In their Answer, Defendants state that Fidelity was incorrectly pled and should be identified as "Fidelity and Guaranty Insurance Underwriters, Inc." (Ans. at 1). (*See also* Def. Br. 4 n.2) ("Fidelity is an underwriting company within The Travelers Companies, Inc.").)

  Defendants also state that HUB was incorrectly pled and should be identified as "HUB International Northeast Limited." (Ans. at 1).

1

I.  **Background**

A. **Relevant Facts**[2]

In December 2013, at the suggestion of her real estate agent, Ms. Luzzi decided to obtain renter's insurance before moving into a second-floor apartment of a two-family home in Woodland Park, New Jersey. (DSMF ¶ 1; Pl. Dep. 13:12-:23, 38:6-39:17). She testified that she "was seeking coverage for renter's insurance, whatever that covered." (Pl. Dep. 44:12-:13). Thereafter, in mid to late December, she telephoned the same company that she used for her auto insurance, Travelers of New Jersey. (*Id.* at 39:24-40:1, 41:1-:2, 43:13-:14). Luzzi spoke to an unidentified individual who told her to call HUB (*id.* at 40:19-:23), an "insurance agency licensed to issue policies of insurance in the State of New Jersey." (Compl. ¶ 1. *See* Ans. ¶ 1) (admitting that HUB "is authorized to conduct business in the State of New Jersey and HUB maintains its principal place of business in the State of New York").

---

[2]  For purposes of this motion, I consider Defendants' Statement of Undisputed Material Facts in support of their motion for summary judgment ("DSMF") (ECF No.48-2), Plaintiff's Responsive Statement of Undisputed Material Facts ("PRSMF") (ECF No. 49 at p. 2-4) pursuant to Local Rule 56.1, as well as the deposition testimony and documentary evidence. Facts not contested are assumed to be true.

Record items cited repeatedly will be abbreviated as follows:

"Compl." = Complaint (ECF No. 1-1, Exh. A)

"Compl. [I, II or III]" = First, Second, or Third Count of Complaint

"Ans." = Answer (ECF No. 6)

"Def. Br." = Brief in Support of Defendants' Motion for Summary Judgment (ECF No. 48-1)

"Pl. Opp." = Plaintiff Luzzi's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 49 at p. 5-7)

"Def. Reply" = Reply Brief in Further Support of Defendants' Motion for Summary Judgment (ECF No. 50)

"Pl. Dep."= Portions of Plaintiff Luzzi's September 20, 2016 Deposition Testimony (ECF No. 48-4, Exh. A)

"Rod. Dep."= Portions of Anna Rodriguez's March 24, 2017 Deposition Testimony (ECF No. 48-4, Exh. C)

2

Luzzi telephoned and spoke to Anna Rodriguez, who she believed was a representative of HUB. (DSMF ¶ 2; PRSMF ¶ 2; Pl. Dep. at 42:20-:22, 43:1-:2).[3] According to Luzzi, during that call, Ms. Rodriguez asked her only the following questions: 1) if she had a fire extinguisher, 2) where the extinguisher was, 3) if she had a deadlock on the door, and 4) how many rooms were in the apartment. (*Id.* at 45:22-:25, 55:1-:2). Luzzi testified that although she thought that the renter's insurance would cover her personal property, no one ever explained to her what the renter's insurance would cover. (*Id.* at 44:14-45:2). Luzzi testified that Ms. Rodriguez did not ask her about her personal property or the value of that property. (*Id.* at 46:10-:11, 54:14-:20). According to Luzzi, Ms. Rodriguez also did not discuss, or ask her about, the dollar limits of coverage. (*Id.* at 47:3-:4). *See* (*id.* at 46:10-:17, 50:21-:22). Luzzi testified that she "trusted" Rodriguez and believed that the questions Rodriguez asked "were the only questions that needed to be asked." (*Id.* at 46:4-:7). *See* (*id.* at 51:1-:4, 54:9-:13). Because she was not asked, Luzzi did not provide any information about her personal property.[4] (*Id.* at 54:14-:20).

Ms. Rodriguez had a different recollection of the telephone conversation. After reviewing her notes of the conversation, Rodriguez testified that she specifically asked Luzzi about personal property; specifically, she asked about furs, fine china, jewelry, or other valuable items. (Rod. Dep. 26:16-:17, 27:8-:10). Based on her notes, Rodriguez testified that she explained valuable-item coverage to Luzzi, who ultimately "declined" such coverage. (*Id.* at 27:1-:25). Rodriguez also recalled that she asked Luzzi if she wanted a "platinum package," which provided coverage for valuable items on an all-risk basis. (*Id.* at 34:8-:17). Rodriguez's notes indicate that Luzzi "declined" that package. (*Id.*

---

[3] Rodriguez's notes indicate that the call occurred on December 26, 2013. (Rod. Dep., Exh. AR-3).

[4] Plaintiff Luzzi was also never asked to provide any additional written information, provide photos of her personal property, or allow an inspection of that property. (Pl. Dep. at 47:25, 51:5-:11).

3

at 34:18-:19. *See* Rod. Dep., Exh. AR-3 (providing a copy of Rodriguez's notes)).[5]

Thereafter, Luzzi moved into the apartment. She received a letter from Travelers dated December 30, 2013, which enclosed a copy of a Travelers renter's insurance Declarations Page and Homeowners Policy Booklet.[6] (Pl. Dep., Exh. A, P-4). The letter identified the policy period as December 26, 2013 through December 26, 2014, and stated, in part:

> You will find important documents related to your Travelers policy and coverage:
>
> **Your New Insurance Policy, which includes your Declarations,[7] policy form and endorsements.** Please take a moment to review these important materials, especially your Declarations Page, which shows the coverages and limits that you have selected.

(*Id.*) (emphasis in original). The Declarations Page set a total policy premium of $126. (ECF No. 48-4, Exh. B at 1). Section I of the form, entitled "Property Coverages," set a $15,000 limit for personal property. (*Id.*) As for the

---

[5] Rodriguez also testified to her general practices. She stated that with "each and every customer" for whom she wrote a renter's policy, she "always" asked "'is [$]15,000 sufficient or do we need to increase that?'" (Rod. Dep. at 13:3-:7). If a customer responded that $15,000 was sufficient, Ms. Rodriguez would not ask any follow-up questions regarding personal property. (*Id.* at 14:24-15:2). However, if a customer stated that $15,000 was not sufficient but did not know the specific amount of coverage that he or she needed, Ms. Rodriguez would ask follow-up questions such as how many bedrooms there were, etc. (*Id.* at 15:23-:25). On the other hand, if a customer stated that $15,000 was not sufficient but provided a specific value that was sufficient, Ms. Rodriguez would use that value and not ask additional questions. (*Id.* at 15:21-:22).

[6] The letter included a Travelers logo in its letterhead and stated, in part, "Thank you for choosing Travelers for your homeowners insurance." (Pl. Dep., Exh. A, P-4). The last sentence in the letter stated: "On behalf of HUB INT'L NORTHEAST LTD, we look forward to serving you!" (*Id.*)

[7] The Declarations Page also included a Travelers logo, and identified "HUB INT'L NORTHEAST LTD" as the agent and "Fidelity and Guaranty Insurance Underwriters, Inc." as the insurer. (ECF No. 48-4, Exh. B at 1).

4

Homeowners Policy Booklet,[8] Section I addressed "Property Coverages," including coverage for personal property. (*Id.* at 13-14).

Luzzi did not read the policy because she "wouldn't have understood it." (Pl. Dep. 65:14). She explained: "I don't understand these policies. They're written way above my head." (*Id.* at 65:15-:16). She also testified that she was unaware that the policy had limits of coverage for certain types of personal property, and never read that section of the policy because she "wouldn't have understood it, anyway." (*Id.* at 73:2-:11). She stated: "I had the policy and I figured I was covered." (*Id.* at 65:20). Plaintiff placed her copy of the policy in a filing cabinet. (*Id.* at 65:19, 71:1-:5).

Nearly two months later, on February 17, 2014, a fire occurred at Luzzi's apartment. (Compl. ¶ 9). After the fire, Luzzi reported the loss to HUB and Fidelity, and submitted a claim for the loss of her personal property. (PSMF ¶ 19; Compl. ¶ 10). Specifically, she submitted "Inventory Submission" spreadsheets in which she identified the items that were lost in the fire. (Pl. Dep., Exh. P-7) (listing 354 items and the "quantity lost" for each of those items)). These included two decorative figurines each of which had a $750 replacement cost, 475 pairs of shoes with a total replacement cost of $56,350, an $8,000 full-length mink coat, a $6,000 three-quarter length mink coat, a $4,500 mid-length mink coat, a $4,000 full-length Persian lamb coat, a $3,000 Persian lamb jacket with a mink collar, four diamond bracelets each of which had a $2,125 replacement cost, and seven gold bracelets each of which had a replacement cost of $857.14. According to Luzzi, her actual damages on a replacement cost basis were $270,000, plus additional living expenses. Fidelity paid $15,000, the policy's personal property limit. (PSMF ¶ 20; Compl. ¶ 10).

---

[8] The cover page for the Booklet includes a Travelers logo and states: "Homeowners Policy Booklet from Fidelity and Guaranty Insurance Underwriters, Inc. Waukesha, WI (A Stock Insurance Company)." (*Id.* at 7. *See* Ans. ¶ 5 (stating that Fidelity issued the policy).)

5

## B. Procedural History

On June 24, 2015, Luzzi filed a Complaint against HUB and Fidelity in the Superior Court of New Jersey, Law Division, Passaic County. (Compl.) She asserts three claims against HUB and Fidelity based on the theory that "[i]n obtaining a policy of insurance from Fidelity," HUB was acting as the agent, servant, workman or employee of Fidelity for the purpose of providing a policy of insurance issued by Fidelity." (*Id.* at ¶ 6).

Count I of the Complaint asserts breach of contract. "In obtaining the policy of insurance for Plaintiff," HUB, as agent for Fidelity, "either negligently failed to obtain the correct information from Plaintiff concerning the proposed insured property" or "failed to transmit the correct information to Fidelity," thereby causing Fidelity to limit Plaintiff's recovery "to only $15,000." (Comp., I ¶ 11).

> By failing to obtain the proper information in order to obtain appropriate insurance coverage for [her] premises or, alternatively in failing to transmit the proper information necessary to obtain insurance coverage for [her] property, HUB *breached its agreement* to obtain reasonable, necessary and proper insurance coverage for [her] property thereby becoming liable for the resulting damage caused by Fidelity's limitation of [her] claim.

(*Id.* at I ¶ 12) (emphasis added).

Count II of the Complaint alleges negligence:

> The direct and factual cause of the uncovered losses was the negligence and carelessness of HUB in failing to obtain the reasonable, necessary and proper insurance coverage for [her] property and/or in failing to properly transmit the necessary information in order to obtain insurance coverage for [her] property.

(*Id.* at II ¶ 2).

Count III of the Complaint alleges negligence/respondeat superior liability:

> The failure of Fidelity's agent HUB, acting within the course and scope of its authority and on the business of Fidelity in failing to obtain and/or transmit the necessary information is negligence and such negligence is imputed to Fidelity under the Doctrine of Respondeat Superior.

6

(*Id.* at III ¶ 4).

The Complaint seeks compensatory damages, attorney's fees, costs of suit, and "such other relief as the Court may deem equitable and just." (*Id.* at text following I ¶ 12, II ¶ 2, III ¶ 4. *See* Comp. ¶ 10 (stating that "actual damages were approximately $270,000.00, plus additional living expenses").

On August 7, 2015, Defendants removed the case to this federal court based on diversity jurisdiction under 28 U.S.C. § 1332(a). (ECF No. 1). Plaintiff then filed a Demand for a Jury Trial. (ECF No. 5). On August 25, 2015, Defendants filed an Answer, Affirmative Defenses, and Jury Demand. (Ans.) On October 14, 2015, Plaintiff filed an Affidavit from Jerome L. Glickman, a New Jersey-licensed property and casualty resident broker. (ECF No. 7 at ¶ 2).

On January 19, 2018, Defendants filed a motion for summary judgment (ECF No. 48) and a brief in support of that motion (Pl. Br.) On February 6, 2018, Plaintiff filed a brief in opposition to Defendants' motion. (Pl. Br.) On February 12, 2018, Defendants filed a reply brief. (Def. Reply). The matter is therefore fully briefed and ripe for decision.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that the court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Hayes v. Harvey*, 874 F.3d 98, 103 (3d Cir. 2017). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to

the district court—that there is an absence of evidence supporting the non-moving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's cases, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. Discussion

The defendants, HUB and Fidelity, move for summary judgment on all Counts in the Complaint. In particular, Defendants argue that 1) summary judgment should be granted in favor of Fidelity because Luzzi has not met her

burden of proving that Rodriguez breached the standard of care applicable to insurance agents when placing coverage, and 2) summary judgment should additionally be granted in favor of HUB because it played no role in the issuance of the policy. (Def. Br. 11-20).

For the reasons discussed below, as to defendant HUB, the motion for summary judgment is granted on all Counts. As to defendant Fidelity, the motion for summary judgment is granted as to Count I, but denied as to Counts II and III.

### A. HUB – Counts I, II, and III

Luzzi alleges that she was directed to HUB, an insurance agency, and that she spoke on the telephone to Rodriguez. Luzzi seems to have inferred that Rodriguez was employed by HUB. On this record, however, there is no documentary evidence or testamentary evidence from a person with knowledge that Rodriguez was in fact employed by HUB.

Defendants admit that in general, "an agency relationship existed between Fidelity and HUB for the purpose of soliciting, binding, executing, and servicing insurance policies and endorsements." (Ans. ¶ 6). The Declarations page of the policy lists HUB as agent. This, however, could merely signify that HUB would be servicing the policy; it does not imply that Rodriguez was working for HUB at the time of the phone call.

Defendants identify Rodriguez as "a Fidelity telephone sales representative and order-taker." (DSMF ¶ 2). Luzzi responds, ambiguously, that Rodriguez was "acting on behalf of Fidelity." (PRSMF ¶ 2). She does not forthrightly respond to the defendants' contention that Rodriguez worked directly for Fidelity, and was not employed by HUB, which did not participate in the telephone call at issue.

At her deposition, Luzzi did not remember the name of the person to whom she spoke. (Pl. Dep. 43:6-:9). When asked if she knew "that HUB was an agent for Travelers" she responded "no." (*Id.* at 43:24-44:1).

For her own part, Rodriguez testified that she was not employed by HUB, but directly by Travelers:

9

> At the time of her communication with plaintiff, Ms. Rodriguez was employed by Travelers as a licensed sales agent. Ms. Rodriguez is now employed in defendant's claim department in Atlanta, Georgia. Is what counsel wrote accurate?
>
> Answer: Yes.

(Rod. Dep. 24:1-:9). Thus Rodriguez, who (unlike Luzzi) has direct knowledge of the facts, stated clearly that at the time of her communication with Luzzi, she was employed not by HUB but by Travelers as a licensed sales agent. (*Id.* at 24:3-:5).

There is no sufficient evidence from which a jury could find that Rodriguez was acting on behalf of HUB (or held herself out as doing so) when she engaged in the December 2013 telephone call with Luzzi. The motion for summary judgment will therefore be granted as to all counts with respect to HUB.

There is no dispute, however, that Rodriguez acted within the scope of her employment by Travelers/Fidelity. The remainder of the opinion discusses the liability of Fidelity for the alleged actions of Rodriguez.

### B. Fidelity - Counts II and III (Negligence/respondeat superior)

Counts II and III allege that Fidelity is liable for negligence. Count II alleges that Fidelity breached a duty to Luzzi by failing to "obtain the reasonable, necessary and proper insurance coverage for [her] property and/or in failing to properly transmit the necessary information in order to obtain insurance coverage for [her] property." (Compl. II ¶ 2). That breach, in turn, led to "uncovered losses." (*Id.*) Count III attributes that liability to Fidelity via respondeat superior. (Compl. III ¶¶ 1-4).

Defendants argue that summary judgment should be granted in their favor because "[g]iven the utter lack of information provided by [Luzzi]" and "the absence of any special relationship" between Luzzi and Rodriguez, "there is absolutely no support" for a claim that Fidelity failed to exercise its duties or

that Fidelity owed Luzzi "any duty to provide her with anything more than what she agreed to purchase." (Def. Br. 16).[9]

I disagree and find that summary judgment is not appropriate. Whatever the merits of the defendants' arguments, I cannot rule on them because there is a genuine issue of material fact as to the conversation between Luzzi and Rodriguez that led to the issuance of the renter's insurance policy.

To prevail on a negligence claim, a plaintiff must prove: "(1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." *Fernandes v. DAR Dev. Corp.*, 222 N.J. 390, 403–04 (2015). The first element, the existence of a duty, is "a matter of law to be decided by the court." *Wang v. Allstate Ins. Co.*, 125 N.J. 2, 15 (1991). The existence of a duty "is largely a question of fairness or policy," and "'[t]he inquiry involves the weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solutions.'" *Id.* (quoting *Kelly v. Gwinnell*, 96 N.J. 538, 544 (1984)). "[T]he legal determination of the existence of a duty may differ, depending on the facts of the case." *Id.*

"At common law both [insurance] agents and brokers, when acting on behalf of an insured, owe the insured a duty of due care." *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 135 N.J. 182, 189 (1994). *See President v. Jenkins*, 180 N.J. 550, 568 (2004) (internal citations omitted) ("Brokers and agents generally owe the same duties to an insured . . . 'Agents, like brokers, are obligated to exercise good faith and reasonable skill in advising insureds' and in informing them of available coverage."). In *Rider v. Lynch*, 42 N.J. 465, 476 (1964), the New Jersey Supreme Court addressed the scope of the duty that an insurance broker owes to an insured or prospective insured. *Rider* recognized that a broker engaged to obtain insurance must

---

9    As discussed above, HUB, according to Defendants, "simply played no role whatsoever in Plaintiff's procurement" of the policy. (Def. Br. at 21). Moreover, HUB had no special relationship with Luzzi and therefore had no duty to provide her with advice regarding the appropriate limits of insurance coverage. (*Id.*)

11

exercise "good faith and reasonable skill, care and diligence in the execution of the commission." *Id.* In particular, the broker "is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected." *Id.* Furthermore, "[a]n insurance agent may assume duties in addition to those normally associated with the agent-insured relationship" if there is evidence of greater responsibilities, i.e. a "special relationship." *Glezerman v. Columbian Mut. Life Ins. Co.*, 944 F.2d 146, 150–51 (3d Cir. 1991).[10]

*Rider* "defined the obligations of a broker as (1) to procure the insurance; (2) to secure a policy that is neither void nor materially deficient; and (3) to provide the coverage he or she undertook to supply." *President*, 180 N.J. at 569 (citing *Rider*, 42 N.J. at 476). "If an agent or broker fails to exercise the requisite skill and diligence when fulfilling those obligations, then there is a breach in the duty of care, and liability arises." *Id.* (citing *Rider*, 42 N.J. at 476). The New Jersey Supreme Court has cautioned, however, that *Rider* does not "limit[] the establishing of a broker's liability to th[o]se three circumstances." *Bates v. Gambino*, 72 N.J. 219, 225 n.2 (1977)).

Here, the alleged liability arises from Rodriguez's alleged failure to ascertain Luzzi's needs and recommend appropriate coverage. "Liability resulting from the negligent procurement of insurance is premised on the theory that a broker 'ordinarily invites [clients] to rely upon his expertise in procuring insurance that best suits their requirements.'" *Aden v. Fortsh*, 169 N.J. 64, 79 (2001) (quoting *Rider*, 42 N.J. at 477); *see also Carter Lincoln-Mercury, Inc., Leasing Div.*, 135 N.J. at 189–90 (citations omitted) (identifying cases where courts have addressed the scope of the duty owed by insurance

---

[10] "Absent a special relationship, 'there is no common law duty of a carrier or its agents to advise an insured concerning the possible need for higher policy limits upon renewal of a policy.'" *C.S. Osborne & Co. v. Charter Oak Fire Ins. Co.*, No. A-2182-15T4, 2017 WL 1548796, at *5 (N.J. Super. Ct. App. Div. May 1, 2017) (quoting *Wang*, 125 N.J. at 11-12). The renewal context, however, assumes that the necessary diligence was performed earlier, when the policy was written; it is common for policies to be renewed on similar terms without much ado.

12

agents and brokers to the insured, and noting that courts have found that the duty includes claims alleging that the agent or broker "failed to advise a client of insurance options" and claims alleging that the agent or broker "failed to obtained insurance that failed to meet the insured's needs").

I find that, as a general matter, Fidelity had a duty to ascertain the customer's needs and recommend appropriate coverage. There is a genuine issue, however, as to the scope of that duty under the circumstances, and whether Fidelity breached that duty.

Defendants assert that "[a]ll of the credible evidence compels the conclusion that Plaintiff accepted the offered coverage of $15,000 for loss of personal property and specifically declined the option of purchasing additional coverage." (Def. Br. 17). They point out that Luzzi paid a low premium for a low level of coverage, and without objection received the declarations page, which clearly stated the coverage limits. The jury, they say, could not accept Luzzi's position in light of 1) her incredible claim that she did not see or understand the prominently displayed policy limit of $15,000; 2) her lack of concern about it until after she sustained a claimed loss of $270,000; or 3) her apparent belief that she had purchased unlimited coverage for a premium of $126. Defendants stress that the jury could and should choose instead to credit Rodriguez's testimony, corroborated by her contemporaneous notes and the natural tendency of any sales person to offer more extensive coverage for a higher premium.

My role here, however, is not to accept the "credible" evidence and discard the evidence that is less "credible." On summary judgment, the court's job is to determine whether relevant facts are in issue. *Anderson*, 477 U.S. at 248–49. Viewing the record and drawing all reasonable inferences in the light most favorable to the plaintiff, I find there is a genuine issue of material fact.

Under such cases as *Aden* and *Carter Lincoln-Mercury, supra,* a broker or agent selling insurance has some duty to ascertain the customer's needs and recommend the appropriate coverage. Rodriguez says she did; Luzzi says she didn't. According to Luzzi, Rodriguez simply signed her up for the minimum

coverage and made no inquiry whatever as to the value of her personal property and other relevant matters. I will therefore deny Defendants' summary judgment motion as to Plaintiff's negligence claims against Fidelity in Counts II and III.

### C. Fidelity - Count I (Breach of Contract)

The parties do not address much attention to Count I of the Complaint, a claim of breach of contract. I discuss it briefly.

To establish a breach of contract claim, a plaintiff must demonstrate (1) the existence of "a valid contract between the parties"; (2) the defendant's "failure to perform a defined obligation under the contract"; and (3) that the plaintiff "sustained damages" as a result. *EnviroFinance Grp., LLC v. Envtl. Barrier Co., LLC*, 440 N.J. Super. 325, 345 (App. Div. 2015) (citing *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007)).

New Jersey does not recognize a breach of contract claim in connection with the procurement of insurance. *See Carter Lincoln-Mercury, Inc*, 135 N.J. at 190 (quoting *Rider*, 42 N.J. at 477) (internal citations omitted) ("Although the relationship of broker to insured may be described as contractual, our cases have recognized that the insured 'does not sue on a contract of insurance.' The claim asserted is based on the broker's negligent failure to procure the appropriate coverage."); *see also Call v. Czaplicki*, No. CIV. 09-6561, 2010 WL 3724275, at *12 (D.N.J. Sept. 16, 2010) (dismissing breach-of-contract claim on the basis that "New Jersey does not recognize a breach of contract claim for conduct that constitutes the negligent procurement of life insurance, and Plaintiffs fail to allege that Defendants breached any provision of the written life insurance policy").

I therefore grant Fidelity's motion for summary judgment as to Count I.

### IV. Conclusion

As to HUB, the motion for summary judgment is granted as to all Counts. As to Fidelity, the motion for summary judgment is granted as to Count I, but denied as to Counts II and III.

14

An Order will be entered in accordance with this Opinion.

Dated: August 21, 2018

**Hon. Kevin McNulty**
**United States District Judge**